DOCTOR F. JACKSON, RESPONDENT, *v.* ANTHONY H. KASSEALL, APPELLANT.

*Livery stable keeper — lien of, upon horses kept under an agreement with the owner — rights of a chattel mortgagee — 1872, chap. 498.*

Section 1 of chapter 498 of 1872 authorizes livery stable keepers and other persons keeping or boarding horses, under any agreement with the owners thereof, to detain such horses until all charges due under the agreement shall have been paid; "provided, however, that notice in writing shall first be given to such owner in person or at his last known place of residence, of the amount of such charges and the intention to detain such horse or horses until such charges shall be paid." Section 2 provides that "from the time of giving such notice, and while such horse or horses are so detained and no longer, such livery stable keeper or other person shall have a lien upon such horse or horses for the purpose of satisfying any execution which may be issued upon a judgment obtained for such charges."

*Held,* that a livery stable keeper who had, under an agreement with the owner, boarded a horse upon which a chattel mortgage had been given and duly filed,

could not, by serving the notice required by the statute upon the owner or mortgagee, acquire, as against the mortgagee, a lien upon the horse for the charges incurred for his keeping prior to the time of the giving of the notice, but only for such as should be incurred thereafter.

That his right to acquire such a lien was not affected by the fact that the mortgagee knew that he was keeping the horse under such agreement.

*Quære,* as to whether a lien for past charges could be acquired as against the owner.

The statute gives no lien upon any wagons, harness or robes that may be kept with the horse, but only upon the horse itself.

APPEAL from a judgment of the Monroe County Court, entered on a decision of that court rendered upon a trial by the court without a jury.

*J. S. Garlock,* for the appellant.

*D. C. Hyde,* for the respondent.

SMITH, P. J. :

The action is replevin. It was brought to recover the possession of a mare, cutter, harness with brass trimmings, a wolf robe and two horse blankets which were owned originally by William L. Palmer. The plaintiff claims the property by virtue of certain chattel mortgages executed by Palmer. The defendant claims a lien on the property, superior to the plaintiff's mortgages, for the keeping and care of the mare and the care and storage of the other property under a contract with Palmer. One of the mortgages under which the plaintiff claims was executed by Palmer to one Peck, and Peck having died, the mortgage was assigned by his administrator to the plaintiff. The other mortgage was executed to the plaintiff. The history of the transactions out of which the dispute arises is as follows : On 8th of August, 1878, Palmer executed to Peck a mortgage upon a wagon to secure him for having indorsed a promissory note for $150, for the accommodation of Palmer, due in sixty days thereafter. On 24th February, 1879, Peck having paid said note and also forty dollars more on Palmer's account, Palmer executed to him a mortgage upon the mare, cutter and harness to secure the payment to Peck of $190 in three months thereafter, with interest. On the day last mentioned Palmer, for a valuable consideration, executed to the plaintiff a mortgage upon the

said wagon, and also upon all the property in suit to secure the payment of the sum of $500 in three months from the date of said mortgage, with interest. Each of said mortgages was duly filed. At the time of the execution of the several mortgages, and for some time prior and subsequent thereto, the defendant kept a stable for livery and boarding purposes, in the city of Rochester, and by an agreement with Palmer, made in February, 1878, he boarded the mare, and when she was at the stable he groomed and took care of her, and he cleaned, stored and took care of the rest of the mortgaged property, for all which Palmer agreed to pay him at the rate of twenty dollars per month. Palmer used the mare and other property whenever and as he saw fit until the 28th July, 1879. On the day when the second mortgage was executed to Peck as above stated, Peck saw Palmer and the defendant at the stable, and caused Palmer to pay the defendant all he then owed him as such stable keeper, and afterwards and on the same day the defendant executed to Peck the said second mortgage, which fact the defendant then well knew. On 28th July, 1879, the Peck mortgages were assigned to the plaintiff. On the same day the defendant served on Palmer a written notice of which the following is a copy: "To W. L. Palmer: Take notice that I claim a lien by virtue of the statute in such cases made and provided upon your mare named 'Dollie,' cutter, one top buggy, one set single harness, and all other horse accoutrements now in my possession, for keep, care and storage of the same, to the amount of eighty-nine dollars and sixty-three cents, and I intend to detain the said horse or mare, and said other property until such charges shall be paid; that said amount is for boarding said mare, being a balance for the same. I further notify you that I claim the same by virtue of a special contract with you therefor. Dated July 28, 1879, (signed) 'A. H. Kasseall.'" After that day the mare was not used by anyone, and on the 1st day of August, 1879, the plaintiff, by his agent, demanded possession of the property in suit from the defendant, and the latter refused to deliver possession until paid the sum of ninety-five dollars and seventy-two cents, claiming that he had a lien thereon for that amount as a boarding stable keeper. After such demand and on the same day, the defendant served on the plaintiff a notice of which the following is a copy: "Rochester, August 1, 1879. To Doctor F.

Jackson: Take notice that the amount of my claim and charges against you for the care and keep and board of your brown mare 'Dollie,' is the sum of eighty-six dollars and ninety-three cents, and that it is my intention to detain such horse in my possession until such charges and all further charges for care, keep and board of said mare are paid. Yours, etc., A. H. Kasseall." At the time when Peck received his mortgages, and afterwards, until his death in May, 1879, he knew that the property in question was kept by Palmer at said stable, and the defendant's terms for keeping, care and storage thereof, and the plaintiff knew the same as early as May, 1879. Upon these facts the question arises whether the defendant has a lien on the property in dispute or any part of it, which is superior to the lien of the plaintiff's mortgages.

At common law a livery stable keeper and agister has no lien unless there be a special contract to that effect. The reason assigned in the books is that he only keeps the animal intrusted to his charge without imparting to it any new value, and therefore he is not within the rule which gives a lien to mechanics, tradesmen and laborers receiving property for the purpose of repairing or otherwise improving its condition. (*Grinnell* v. *Cook*, 3 Hill, 485, and cases cited by BRONSON, J., pp. 491, 492.)

There is no proof in the present case of a special contract giving a right of lien. The defense rests upon the provisions of chapter 498 of the Laws of 1872, the first section of which act is as follows: "Section 1. It shall be lawful for all livery stable keepers and other persons keeping any horse or horses at livery or pasture, or boarding the same for hire under any agreement with the owner thereof, to detain such horse or horses until all charges under such agreement for the care, keep, pasture or board of such horses shall have been paid. Provided, however, that notice in writing shall first be given to such owner in person, or at his last known place of residence, of the amount of such charges and the intention to detain such horse or horses until such charges shall be paid." "Section 2. From the time of giving such notice, and while such horse or horses are so detained and no longer, such livery stable keeper or other person shall have a lien upon such horse or horses for the purpose of satisfying any execution which may be issued upon a judgment

obtained for such charges." " Section 3. This act shall take effect immediately."

This statute was amended in 1880 (Laws 1880, chap. 145), but as the amendment was not adopted till after the defendant had given notice of his claim it does not affect the present case.

It is to be observed that the statute gives no lien upon anything but the " horse or horses," for whose keeping the debt accrued. So that as to all the property in dispute, except the mare, the defense fails.

As to the mare, the question is whether the defendant had a lien, as against the plaintiff's mortgages, for that part of his demand for the keeping of the mare which accrued prior to the time of giving notice of his claim. If he had not such lien, he is liable for the detention of the mare after she was demanded by the plaintiff. Clearly that is the case if his lien is to be regarded as having its inception at the time of giving notice to the plaintiff, because such notice was not given until after the defendant had refused to surrender to the plaintiff the possession of the property. The result is the same if the lien arose on giving notice to Palmer, for the reason that when the plaintiff demanded the property, the defendant refused to deliver it unless he was paid the whole amount due him for the keeping of the mare, including that which accrued prior to the giving of notice to Palmer. All that he could properly require was that he should be paid so much of his claim as had accrued subsequently to the giving of such notice, and he having refused to give up the property unless he was paid his entire claim, it would have been an idle ceremony to tender the small sum that had accrued subsequently to the notice, and the plaintiff was relieved from the necessity of so doing.

It is clear, from the language of the statute, that the defendant had no lien until he gave notice as required by the act. And the real question is whether such notice had a retroactive effect, so as to give the defendant a lien, as against the plaintiff's mortgages, for that part of his demand which accrued before the notice was given. We think not. As we understand the statute, the notice operated to give the defendant a lien, the same as a special contract to that effect, between him and Palmer would have done. But Palmer and the defendant could not have cut off the prior rights of the

plaintiff under his mortgages, by an agreement between themselves that the defendant should have a lien for the keeping of the mare prior to the agreement. Again, if 'a notice given under the act operates retrospectively, it is immaterial for the purposes of the lien at what stage of the period of the keeping the notice is given; one given on the last day would be as effectual as one given on the first day. Such a construction would defeat the very object of requiring a notice to be given, which evidently is to advise the owner and all others interested that a lien is claimed, and to enable them to take such action as they may deem necessary in view of such claim.

There are no words in the act which indicate an intent that the notice shall be retroactive. The provision that the notice shall state the amount of the charges, is for the benefit of the owner. We think it refers to the charges thereafter to be made, and has no reference to those which accrued before the giving of the notice.

It does not aid the defendant, that the plaintiff and Peck knew when they took their mortgages that the defendant was keeping the mare under the agreement with Palmer. Without the notice required by the act there could be no statutory lien.

If the defendants suffer a hardship it is the result of his delay in giving notice. His entire claim has accrued since the mortgages of 24th February, 1879, were given. At that time, as is found by the trial court, Peck caused Palmer to pay the defendant all he then owed him, and the execution of the mortgage to Peck on that day was with the defendant's knowledge at the time. Had he given notice then, Peck might have taken steps to strengthen his security so far as to protect himself against the defendant's claim.

The case of *Scott* v. *Delahunt* (65 N. Y., 128), cited by the defendant's counsel, is not applicable to the present case. That was the case of a common-law lien on a canal boat for repairs, and it was held that the lien of the shipwright was superior to that of a prior mortgagee, who after default in the payment of his mortgage had suffered the mortgagor to remain in possession of the boat, running it as his own. The mortgagor was held under those circumstances to be authorized by the mortgagee to keep the boat in repair and to confer a right of lien thereon for repairs necessary to make her fit for navigation. The case has no bearing upon the

question whether a notice under the act of 1872 has a retroactive effect.

It was held by 'the Court of Appeals, in *Bissell* v. *Pearce* (28 N. Y., 252), that a mortgagor of horses has no right to pledge them, or otherwise to create a lien upon them for their keeping, to the prejudice of the rights of the mortgagee. In the opinion delivered in *Scott* v. *Delahunt*, that case was distinguished from *Bissell* v. *Pearce.*

In what we have said we have not intended to deal with the question whether a lien can be created as against the *owner* for past charges. We have considered only the case now before us of a prior mortgagee.

Several exceptions were taken at the trial by the defendant's counsel, but only one of them was noted in his points and that requires no comment.

The judgment should be affirmed.

HARDIN and BARKER, JJ., concurred.

Judgment affirmed.